Good morning everyone. The first argued case this morning is No. 16-16-74, Isola USA Corporation v. Taiwan Union Technology, Mr. Phillips. Good morning, Your Honor. May it please the Court. I want to focus primarily and maybe exclusively on what seems to me is the fundamental error committed by the District Court in this case, which is their attempt to exercise jurisdiction over TUC. I have a question about that. It's sort of two, really. On more than one occasion, the District Court effectively says that your client engaged in litigation misconduct. For example, the District Court made factual findings that TUC and its witnesses didn't provide credible testimony regarding jurisdiction issues. The District Court observed that TUC's witnesses, quote, did not respond credibly when questioned under oath and, quote, submitted at least one false declaration stating that TUC conducted no commercial activity towards Arizona. I want you to address those accusations, okay, but specifically in this conduct, in this context, okay? If we agree with the District Court that TUC's attempts to suppress discovery evidence is to blame for what's now an argument that you're making that there's lack of evidence for a proper personal jurisdiction analysis, can you cite as the court precedent that TUC did not provide credible testimony? Is there a precedent that would prevent us from looking to circumstantial evidence, as the District Court did, to support exercise of personal jurisdiction? Well, there's no case that says you can't look at circumstantial evidence to that effect, but I think you want to answer your question, but let's put it in context. We're talking about a situation where there's no proof of any TUC products at all in Arizona, and there's nothing that our client could have testified to that would have affected that finding by the District Court. There's no proof whatsoever that the plaintiff's made no effort to find a TUC product in Arizona. There's no evidence of a sale that took place in Arizona. There's no evidence of an offer to sell in Arizona. There's no question that TUC does not have a license to do business in Arizona, so it is, in the best of circumstances, totally remote. I don't deny, I don't dispute, that the District Court found that there were statements, one of which was false and one of which was potentially misleading, but what she said was, I am not going to consider their testimony, which seems to be the right solution to that problem. If you find the testimony lacking credibility, you dismiss it out of hand, but that doesn't absolve the plaintiff of its responsibility to prove that the District Court has a basis in the evidence that shows that there is more than random, fortuitous, and attenuated contact. There are two states where we have customers in the United States. One is New York and one is Wisconsin. But just to clarify, I mean, these meetings that they were having with corporate executives of two different companies, what their client was trying to do was to try to persuade these people in Arizona to instruct their supply chain people to use your infringing resin composition. Well, candidly, maybe if you want to draw that inference, I suppose you could. Let's assume the District Court necessarily drew that inference. The purpose of these meetings was to persuade and induce these people from Intel and Emerson to instruct their supply chain people to use your client's infringing resin. And so, therefore, the situs of your 271B liability of actively inducing someone else to infringe occurred in Arizona. I think that's part of the District Court's analysis. Well, the District Court didn't actually analyze it in terms of induced infringement. I mean, her basic position was there's enough purposeful availment in Arizona based essentially on five contacts over five years that generated a grand total of zero sales, zero offers to sell, and zero products in Arizona. So, you can draw whatever inference you want, but the absence of any evidence of infringement anywhere... Okay, I guess we can move on to that. I mean, she did point to something as evidence that there was a pattern of product getting into Arizona. Now, that particular set of pages in the record you've marked confidential, and so what I'm trying to figure out now is to what extent can we actually discuss it. I think we can discuss it here. You're not saying that we can't. I'm talking about A37120, A37123. Well, I'm talking about a series of emails, this little email chain. Is it okay for us to talk about the content of those emails? These are from your client to others. It's a question from a customer to our client. I never think about that. Right, and then your client... It's post-date. I understand. In the email chain it says it assures Agilent that it's okay to continue shipping these laminates, prepregs, whatever they are, into Arizona. So there's no obstacle to that. And remember, the question comes up in the context of... I mean, it's pretty clear to me that the customer doesn't understand patent law because the question has to do with the state of Arizona somehow being concerned about what's going on here. This question could have just been easily asked. This company is very concerned about shipping its product to Arizona because it's aware of this lawsuit that had just been filed in the District Court of Arizona, and it didn't want to get pulled into that lawsuit. And then your client said, well, in a draft email, it proposed to say, okay, ship to Arizona. It also told... Well, let me finish, though. Let me finish. It also said to Agilent, keep going, business as usual. Right? And then internally, there was one email from one of your client's employees to another employee saying, just go ahead and tell Agilent to keep going, business as usual. So from those statements, business as usual, I think it's fair to support this court's finding that this was evidence that there was already an established pattern of these supply chain people feeding into Arizona these prepregs that include the resin composition. I would say... And so therefore... Well, let's say that that was part of their finding, the District Court's finding. One is this email chain represents that there was a pattern ongoing, even before the complaint was filed, of this resin composition product getting into Arizona. Two, that all of these meetings of TUC employees parachuting into Arizona over and over again, over a four or five-year span... Five times in five years? Okay. That sounds to me sporadic. It probably sounds like a pattern to me. Well, yeah, they would have trade fairs, and people would go and attend the trade fairs, and they would be held in Scottsdale, Arizona, which is... Well, that's part of the story. Then there were other stories where there were specific meetings with these executives. And they all invited them to come meet in Arizona, and they followed that advice. But at the end of the day, Arizona remains the last place, maybe not the last place, clearly an inappropriate place in which to adjudicate this, because the place to adjudicate it is in New York, or Wisconsin, or as we can say below, in California. You know, we've been looking for bright lines of some sort. What additional, what more, in your view, in your theory of the case, would have to have been done in Arizona? Would they have to be incorporated in Arizona? We know that that's easy. However, we also know that there certainly can be additional acts besides the state of incorporation. We also know that there's a jurisdiction in the state of incorporation, even if you aren't selling anything there. So that, since they're not incorporated in Arizona, how much more do you think would have to have been done in Arizona to come up with an easy answer? We made any sales in Arizona, or if we had entertained any offers to sell in Arizona, that would be a sufficient basis. So the difference between, let's say, inducement and an actual offer would be where you would draw a line? Yes, because, again, you have to have infringement. And there's no proof of infringement. We don't know where any of the infringements took place. Remember, 90% of the products sold by my client are sold outside the United States. I mean, there's nothing wrong with making this goo and then converting it into a green grape lemonade. That's not before us. We're looking at the 10% that's sold in the United States. Whatever else they do is another problem. But none of that is purposely availing itself of Arizona. All of that is basically selling to New York and Wisconsin. And what happens after that is largely the fortuities of where those fabricators end up selling their products. But they'd have the same problem in New York. They're not incorporated in the United States. They don't have a distributor that's incorporated, a wholly owned entity. So on your theory, it looks as if you're saying you can't be sued, although you can conduct widespread infringement. No, absolutely not. I think we could be sued without doubt in New York. We could be sued in Wisconsin. And we agreed to be sued in California. And as I understand it, we wouldn't withdraw that. We would consent to that even if there were questions about it. But you say that there's no – they're not doing any more in New York or Wisconsin than in Arizona? No, we do much more in Wisconsin than New York. We actually sell our products to customers in New York and Wisconsin. Those are the fabricators. So you draw the line between saying, please order your supplier, instruct your supplier to use our product. That isn't enough. But if it succeeds and the supplier does follow the instruction and use the product, then jurisdiction is established where the inducement occurs? Yes, I would draw that line. And the reason I would draw that line is that all you're doing is marketing. And I don't think that marketing that happens to take place in Arizona once a year or every year for five years represents anything other than sporadic and attenuated because you're not marketing to your customers. You're marketing to your customers' customers. And all you're trying to do, frankly, is as a small company, create some brand and some visibility. It happened to take place in Arizona, but the reality is every single one of these contacts is happenstance that it's in Arizona. It could just as easily have been in Ohio or Pennsylvania or anywhere else. So is the line whether the marketing succeeds in Arizona? Yes, if the marketing succeeds and they actually buy products, then you have availed yourself of that jurisdiction by, in fact, getting some economic benefit out of the system. But what we don't know, is that in the record? Whether Intel and the ultimate customer accepted the representation? All we know is there's nothing in the evidence. There's no evidence whatsoever that Intel made any sales or made any purchases of any products that infringe under these circumstances. And remember, the fact is— Is that an economic benefit to build a potential client base? Not one that I think attaches in a meaningful way to the litigation and the forum. In this case, the way the due process clause— You're not going in there in a pattern to do it. Well, again, this court has rejected the idea that if you go to California and you advertise on a daily basis to try to get sales, and you don't get sales, that's still not enough to serve as a basis for jurisdiction in a particular forum. We didn't come anywhere near that particular outcome in this particular case. We show up five times. We have five conversations, none of which we know about. And again, it's not as though the plaintiff didn't have access to this information. They didn't seek any third-party discovery. They could have asked Intel. They could have asked this guy, Tisdale, who had all these meetings. What went on? What did they do? That's their burden to demonstrate that if they want to have the advantage of their home court as the forum for adjudicating this dispute, that there are sufficient contacts between our clients— Well, we'll see what they say about that. Well, we will see what they say about that. But from my perspective, I think the Supreme Court's decisions in the last five years have demonstrated a pretty clear disfavor to the idea of hailing defendants into courts where they don't have significant contacts. And I submit to you that the contacts in here do not satisfy that test under any circumstances, and I would urge you to reverse on that basis. I'll take the 48 seconds I have to just shift slightly to the question, although I don't think the court below had jurisdiction, but it seems pretty clear to me that at least on the resin composition, this Court said the last time this issue was here, is that the resin composition in this case is used to manufacture laminates and prepregs. And the distinction there is as clear as it can be. This is not a patent that covers laminates and prepregs. This is a patent that covers the goo that you heat up to make into prepregs and laminates. That's a distinction that comes through the specification, comes through the prosecution history. We don't sell the goo to anybody. We use it ourselves in Taiwan. We make it into prepregs and laminates, and that's what we ultimately sell to the intermediate customer who ultimately puts it into the original manufacturer. Let's hear from the other side, and we'll save some rebuttal time. Mr. Phillips? Thank you, Your Honor, I appreciate it. Mr. Malloy? Good morning. May it please the Court, I'm happy to address any questions the Court has, but I thought I might start with a jurisdictional issue just to respond to a few of the points that were raised in both questions as well as counsel's responses. The suggestion that there were only five trips in five years and that these were sporadic and attenuated contacts, I think, goes directly to the heart of the Court's credibility finding in this case, which was that TUC was not upfront about its jurisdictional context. From the outset of the case, TUC said in its first papers filed with the Court that it did no business whatsoever in Arizona and that it had no contacts with Arizona. And as we began to develop the evidence of their contacts with Arizona, the goalposts continually moved. And what the Court's finding in the post-trial order reflect was the acknowledgement that we didn't get all of the information regarding their Arizona contacts. And that's not based on speculation, it's based on evidence presented at trial regarding TUC's customary and ordinary business practices. The OEMs are the decision-makers in this process. They're the ones who decide which products get specced in. They're the ones who decide which materials get used in the ultimate products here. So while TUC doesn't sell directly to those OEMs... Is there a fact-finding by the District Court on that, or at least evidence to support the idea that the OEMs are the ones that hold the strings? So I don't know that there are specific factual findings made by the District Court in the context of the jurisdictional issue on that issue. The Court did refer to downstream customers' use of the products in the context of its inducement findings. And there are several citations to the record that we've included in our brief that discussed both from my sole witnesses and TUC witnesses about the importance of the OEM testimony. Was there any discovery done to the OEMs? There was, Your Honor. We served subpoenas on a dozen different OEMs. And the challenge, and I don't know if there's a record site for this, but the responses we received back is that OEMs don't track materials at this low level, which are essentially a material used in a subassembly in a component of their products, as to where those products go in terms of whether they even go to the United States or whether they go to specific states. What about trying to depose Tisdale, for example? Your Honor, I suppose we could have disposed Mr. Tisdale or any of these other individuals. We chose to depose the TUC witnesses because we had some of their e-mails and because they were the ones who best knew what their contacts were with the state or with anybody in Arizona, as well as why they were doing it. And they were pretty clear, I think, throughout trial as to why they were going to the OEMs. Mr. Lin indicated that they market to the OEMs because they're the ones who made the decisions in the process. And that's at 27263 to 27265. Mr. Hickman, our marketing witness, Mr. Lin's counterpart, also testified at trial regarding the importance of marketing to the OEMs. That's at 27319 to 27327. And so this is why these contacts are so important, not just commercially, but also legally because they represent inducement. This was our inducement theory at trial, that the TUC was inducing the OEMs to use their product here in the United States and use it as an act of direct infringement as well, not just sale, not just offers for sale, and not just manufacturing, but use. And there was extensive use regarding the OEMs, extensive evidence regarding the OEMs' use of these products here in the United States. So can you give us a bright line? Let's say that you vigorously try and sell your product and nobody buys it. Is that enough to provide jurisdiction? I think it would be, Your Honor. So how vigorously, then, do you say inducing? How do we know that the barrier has been crossed where it's fair and just to sue this company and its jurisdiction? I think, Your Honor, I don't know exactly where to draw that line. But isn't that what's before us? I think to some degree, yes. But I think what happened here goes well past whatever line needs to be drawn on that issue. Because what you have is a company sending its marketing executives over and over again. But you told us there's no way of knowing if it succeeded. No, there's quite a bit of evidence that it succeeded, Your Honor. We know that Emerson, Intel, and IBM, the three OEMs with whom TUC had contacts in Arizona, have all qualified this product for use in their products. This product, but they could also buy it in New York? The same product? I don't know that any of them. I suppose they could buy it from a third party in New York. That's correct. Now, Mr. Phillips tells us that there is a more solid basis for jurisdiction in other states than in Arizona. But the jurisdiction still depends, does it not, on customer demand? I think the jurisdiction, Your Honor, depends on TUC's activities, the defendant's actions, not what happens with third parties down the line as to who might decide to test or purchase or sell a product in a particular state. The inquiry should be on what did TUC do with respect to Arizona. But don't you have to eventually establish actual infringement in order to make a case for inducement? What we do to succeed on a claim for inducement, and I guess we're in somewhat of a procedural unique spot in that we're addressing jurisdiction after a full trial on the merits. But what this court said in synthese was that what we're really evaluating in the jurisdictional context is due process and whether due process allows and supports jurisdiction over the party, not liability for infringement at that stage. Now, here we have a liability finding of inducement, so I don't think that's an issue. I recognize not all plaintiffs coming into this court analyzing jurisdictional issues will have that benefit. You cited as 27263 to 265 Mr. Lynn's testimony for the proposition that he conceded that the OEMs make the decision. Where is that in there? I mean, it dances around. I think what he's saying is they market to PCB and OEMs to make them familiar with the material properties of the TUC product. And so part of this exercise is not just selling to their direct customers, but also selling to the indirect customers, really the parties making this decision. And, Your Honor, if you could give me one moment, I may have another. So, Your Honor, just two additional citations. One from Mr. Sin in the context of e-mails post-suit, talking about the importance of convincing customers, top customers, to continue purchasing. That's 30135, as well as 40277. And I would also refer back to Mr. Hickman's testimony, Isola's marketing advice, who spoke to this issue in more detail as well. And I guess, Your Honor, that's the last point I wanted to address on jurisdiction subject to any questions the court may have, which is that this is not, as counsel suggested, largely the fortuities of what happens down the road. This is the business. Marketing these components and these materials to convince OEMs like Intel, Emerson, IBM, whoever it may be, to spec these products, these materials, into their final OEM products is where the sale is made. Well, it appears there are plenty of potential buyers in Arizona. I think that's fair, Your Honor. But I think the district court identified five different visits with three different OEMs, as well as a communication with one of the direct PCB customers that they have, Sanmina. But certainly there were a number of OEMs, again, all of whom qualified the product, which means they had to have used it, they had to have tested it. And Mr. Land, in particular, testified that that can be a years-long process to get those products qualified in the OEM materials. But Mr. Phillips says that they may have qualified the product, but that doesn't qualify the particular producer in Arizona. It does. The qualification process is not just for a specific product, but it's for the specific product made by THC. So they aren't qualifying prepregs and laminates generally. What they're doing is testing specific supplier products to determine whether those products will meet their specifications. Which means they had to have had it, is that correct? They had to have had it, and not only that, they had to have tested it. And we've seen some of the testing that the district court referred to in one of her footnotes in the order with respect to Emerson and their testing of this product. And we see several emails as well as test data that reflect that testing. Agilent, they are a supplier of what? I think Agilent makes several different products, Your Honor. And I don't know specifically what products are at issue in this case. I believe there's a reference in that email to... I guess what I'm wondering is, Agilent in those emails is sending product into Arizona and is concerned about continuing to send product into Arizona. What is that? Who are they sending it to? Do you know? So I don't necessarily think, Your Honor, that email reflects Agilent's concern about it sending product into Arizona. I think it's concern about a product, a board, being sent into Arizona for inclusion in a broader product. So it wasn't clear to me that they were the ones sending the product into Arizona. They may be receiving it from a PCB manufacturer. Okay. Could you speak to Mr. Phillips' last point during his opening argument about the whole question of whether the resin is something that's divorced from the laminates and prepregs in such a way that they aren't infringing? Sure, Your Honor. Thank you. TUC's argument that the resin must be limited to unreacted resin is contrary to the specification, which repeatedly refers and uses the term resin composition to describe cured resins. Is this part of his argument, which was to say that even the... I thought his argument was even the final version of the composition, it's not infringing if it's put into prepregs and laminates. So I assume, Your Honor, that he's referring to the claim construction issue with respect to the issue of resin composition and whether that can include unreacted or is limited to unreacted resin or whether it also includes the cured resin, such as that that's found in the laminates in the prepregs. And the spec refers repeatedly to resin compositions as cured resins. In other words, it talks about the properties of those resin compositions, such as high TG, good thermal properties, good electric properties. Brittleness, for example, is another one. Those are all properties, whether they be thermal, electrical, or physical, that only apply to the cured resin. And it's strong evidence that the specification is referring to the term resin composition to include both the uncured resin as well as the cured forms of the resin. That's also consistent with this court's decision in Exxon v. Lubrizol, where the court construed the term lubricating oil composition to mean any composition where the ingredients were combined at any time. There were no temporal restrictions, whether it be pre-reaction or post-reaction, regarding the composition itself. And that's exactly what the district court held here. So are you saying that the curing then occurs in Arizona? No, the curing occurs outside of Arizona. Okay. Okay, so it would have to be the uncured resin. I have the impression from the briefs, perhaps, as a matter of craftsmanship, much is made but that the district court was concerned about the conflict in testimony of the executives as to what they did or didn't try and do in connection with client contacts in Arizona. Have you a perception as to how that worked at the hearing? No, I'm sorry, I'm not sure I understand. Well, we're told that the executives testified that they had no contacts with Arizona. Yeah. And that the evidence was contrary. Yeah, Your Honor, when TUC made its initial motion to dismiss in this case, they stated under oath that they had no contacts with Arizona, that they didn't do business in Arizona. And as the email production unfolded, we determined and saw that there were several TUC executives that had contacts with Arizona. There's also evidence in the record that they made other sales of other products into Arizona, which I recognize isn't relevant to the specific jurisdiction analysis, but I think it goes to reinforce the court's credibility issue. Your Honor, it looks like I'm close to my rebuttal time, unless the court has any additional questions. Happy to see you. Any more questions? Okay, thank you. Yes, I see you saved a minute for rebuttal. That's on your cross appeal, but we'll see. Mr. Phillips. Thank you, Your Honor. I'll try to be brief. Judge Chen, in response to your question with respect to the Agilent email, I think it's important to put it in context. That initial email says, if we happen to be selling products in Arizona, it's a hypothetical. And they say, what do you do with a hypothetical? And they say, continue business as usual. And the reason they say that is because we have all along believed that we don't infringe this patent because it's limited to the goo and not to the laminates, and therefore there is no basis for infringement. And that's all that shows. It all happened after the location was brought. Second, that's the question, did he do any third-party discovery? They tried with the OEMs. Why don't you go to the fabricators, who he knows are our clients and to whom we make direct sales, and ask them to whom they sell their products and do any of those products end up in Arizona? It's an easy enough way to go about this, putting aside the idea of why don't you ask the people who are identified? Tisdale is specifically identified. What happened? What were those contacts about? It's the plaintiff's burden to establish that. It's not enough that there are contacts. Those days are gone. They have to be something other than problematic. So supposing that the district court was indicating that based on the litigation misconduct with which we started, it was inclined to find circumstantial evidence. You could have gotten an affidavit from those witnesses, couldn't you? We could have. You say it's not my burden. But if at that point you need to rebut what the district court is taking as a given because of the misconduct, why didn't you do it? Well, there are two things to say about that. One is the appropriate response to saying that you've been misled is to ignore the testimony. She did that. That's the right thing to do. And then the question is, if she is going to impose a sanction, you know the law of evidence as well as I do, falso in unum, falsus in omnia? To be sure, but it's still not our burden. And the question is, if she was going to impose a sanction of shifting the burden of proof, you can't do that without giving us notice that it is now our burden of proof. You can't come in after the trial and say, well, there's a week in my life I'm not getting back, and so, oh, my goodness, these are seriously difficult questions on personal jurisdiction, which she concedes, and then say, well, I'm just going to sweep it aside because they weren't as honest as they could have been. If she wanted to put the burden on us, she should have put the burden on us. She didn't do that. She simply said that these were sufficient contacts. And what I'm telling you is that under the Supreme Court's rules is that what you require in order to have sufficient contacts, and even in this Court's rules, this Court has made it very clear, marketing in a particular state is not enough. And if you take up the question of... Shoot, I lost the page. Anyway, and Grover says it clearly is possible that mere marketing, if you don't make any sales, and Mr. Lynn's testimony that he cited, that was what I was going to get at, says simply because you qualify for the spec doesn't mean you make any sales of products. There's no connection between qualifying for a spec and making any sales. It just gives you an opportunity. Again, that's got nothing to do with contacts in a meaningful way, in a substantial way, with this litigation under these circumstances. And then the last thing I guess I would say with respect to the resin versus the composition, I'd urge the Court to look at page 11 of our brief and look at the 414 patent, look at the 215 patent, 258 patent, and what do they say? A resin composition comprising X. What's the next one? A laminate made from a resin composition comprising X. At the end of the day, they have consistently recognized the fundamental difference between laminates and resins. It's not surprising. He says, read the spec. The spec covers both. It covers the entire history of what went on here. But if you look at the claims, it's just ingredients. And my client only puts those ingredients together in Taiwan, heats them into a completely different product in Taiwan, and then ships them out 90% to the rest of the world, 10% to two entities in New York and Wisconsin. That's the place that there should be litigation involving this particular dispute. It should be in Wisconsin or New York or California, not Arizona, where the plaintiff gets the benefit of the home court. Any further questions? Any more questions, Mr. Cook? Thank you, Mr. Phillips. Mr. Malloy, you saved a minute, but I didn't hear your cross-appeal. I don't know that it will take that long, Your Honor. Our cross-appeal is with respect to the court's granted JMOL with respect to willful infringement, as well as the denial of enhanced damages and the reduction of attorney's fees. All of those things were evaluated under the CDATE standard, and the court granted JMOL based solely on the objective prong. Since the Supreme Court's decision in HALO, the objective prong is no more. And so we believe that a remand on the issue, assuming we went on liability, a remand to the court to reconsider the issue of willful infringement, to reconsider the issue of enhanced damages, and to reconsider the issue of the reduction in attorney's fees, which was based on a lack of a willful finding that is appropriate. Okay. Thank you. I'm happy to answer any further questions. Okay. Thank you. Thank you both. The case is taken under submission.